1  Richard C. Solomon (State Bar no. 41107)
   Zimmer & Marcus, LLP
2  2640 Las Encinas Lane
   Santa Barbara, CA 93105
3  phone: 805.452.5839
   fax:    805.687.4156
4
   Attorneys for Plaintiffs, Vandenberg Action
5  Coalition and Elden Booth

6

7

8            IN THE UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11

12  VANDENBERG ACTION COALITION, an          )   Case no. CV 01-10526 RSWL (RCx)
    unincorporated association, and           )
13  ELDEN BOOTH,                              )
                                              )   MEMORANDUM OF POINTS
14          Plaintiffs,                       )   AND AUTHORITIES IN
                                              )   OPPOSITION TO DEFENDANTS'
15  vs.                                       )   MOTION FOR SUMMARY
                                              )   JUDGMENT; DECLARATIONS
16  COL. ROBERT M. WORLEY, II, Base          )   AND EXHIBITS IN SUPPORT
    Commander of Vandenberg Air Force Base,   )
17  UNITED STATES AIR FORCE, an agency of     )   Hearing Date: February 10, 2003
    the United States Government,             )   Time: 9:00 a.m.
18                                            )
            Defendants.                       )   Hon. Ronald S. W. Lew
19  _____ )

20

21

22

23

24

25

26

27           ENTER ON ICMS

28           JAN 2 7 2003

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. PLAINTIFFS HAVE STANDING BECAUSE THE AREA RESTRICTIONS WILL BE IMPOSED ON FUTURE EVENTS WITHOUT FACTUAL BASIS AND THOSE RESTRICTIONS PREVENT PLAINTIFFS FROM MEANINGFULLY EXERCISING THEIR RIGHTS OF FREE SPEECH AND ASSEMBLY  . . . . . . . . . . 4

II. THE COURT DOES HAVE SUBJECT MATTER JURISDICTION OVER THE DEFENDANT U.S. AIR FORCE AS AN AGENCY OF THE UNITED STATES  . . . . 5

III. DEFENDANTS' MOTION BASED ON THE AREA RESTRICTIONS MUST BE DENIED BECAUSE THE PHYSICAL LOCATION OF THE BOUNDARY LINE IS A MATERIAL ISSUE IN DISPUTE AND, ALTERNATIVELY, DEFENDANTS HAVE FAILED TO SHOW THAT RESTRICTING EXPRESSIVE ACTIVITY TO A NARROW STRIP AT THE MAIN ENTRANCE IS JUSTIFIED BY MILITARY OR OTHER NECESSITY OR LEAVE OPEN AMPLE ALTERNATIVE METHODS OF COMMUNICATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Both Sides Have Introduced Sufficient Evidence to Support Their Respective Contentions as to the Physical Location of the "Green Line" . . . . . . . 6

B. Alternatively, Regardless of the Position of the Right-of-Way Line, First Amendment Activity Must be Allowed on the Grass Area Because it is a Public Forum and the Area Restriction is not Narrowly Tailored to Leave Open Ample Alternatives to Communicate and Assemble  . . . . . . . . . . . . . . . 7

1. *The Grass Area in Dispute is a Public Forum*  . . . . . . . . . . . . . . . . . . 7

2. *Plaintiffs Have Shown That the Restriction Unduly Interferes With Their First Amendment Rights and Defendants Have Not Shown That its Complete Ban on First Amendment Activity on the Grass Area in Front of the Stone Walls is Narrowly Tailored to Achieve a Significant Government Interest*  . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3. *The Area Restriction Fails to Provide Any Alternative Forum for the Meaningful Exercise of the Rights of Speech and Assembly* . . . . . . 14

IV. PLAINTIFFS ARE ENTITLED TO A DECREE PRESERVING ACCESS TO A SUITABLE AREA FOR PARKING PURPOSES NECESSARY TO ALLOW PEOPLE TO MEANINGFULLY EXERCISE THEIR FIRST AMENDMENT RIGHTS AT THE SITE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

# TABLE OF AUTHORITIES

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . 4

Flower v. United States, 407 U.S. 197 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

Greer v. Spock, 424 U.S. 828 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hague v. Comm. for Industrial Organization, 307 U.S. 496 (1939) . . . . . . . . . . . . . . . . . . . . 8

Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123 (1951) . . . . . . . . . . . . . . . . 4

Members of City Council v. Taxpayers for Vincent, 466 U.S. 789 (1984) . . . . . . . . . . . . . . . 4

Singleton v. Wolff, 428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Albertini, 472 U.S. 675 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bay Area Peace Navy v. United States, 914 F.2d 1224 (9th Cir. 1990) . . . . . . . . . . . . . . . . . 15

Edwards v. City of Coeur D'Alene, 262 F.3d 856 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 14

Gerritson v. City of Los Angeles, 994 F.2d 570 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . 8, 13-14

Hale v. Dep't of Energy, 806 F.2d 910 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

M.N.C. of Hinseville v. U.S. Dep't of Defense, 791 F.2d 1466 (11th Cir. 1986) . . . . . . . . . . . . 9

Montana Wilderness Association, Inc. v. U.S. Forest Service, 2003 U.S. App. Lexis 73 . . . . . . 7

Persons for Free Speech at SAC v. U.S. Air Force, 675 F.2d 1010 (8th Cir. 1982) . . . . . . . . . . 9

Sheehan v. Army & Air Force Exchange Service, 619 F.2d 1132 (5th Cir. 1980) . . . . . . . . . . . 5

Shopco Distribution Co. v. Commanding General, etc., 885 F.2d 167 (4th Cir. 1989) . . . . . . . . 9

United States v. Gourley, 502 F.2d 785 (10th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Weinberg v. City of Chicago, 310 F.3d 1029 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 15

CCCO-Western Region v. Fellows, 359 F. Supp. 644 (N.D. Cal. 1972) . . . . . . . . . . . . . . . 10, 11

Church of Scientology v. Linberg, 529 F. Supp. 945 (C.D. Cal. 1981) . . . . . . . . . . . . . . . . . . . 5

New Alliance Party v. Dinkins, 747 F. Supp. 1055 (S.D. N.Y. 1990) . . . . . . . . . . . . . . . . . . 14

United States v. DeMott, 151 F. Supp. 2d 706 (E.D. Va. 2001) . . . . . . . . . . . . . . . . . . . . . . . 9

5 U.S. C. section 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

**INTRODUCTION**

This action involves two distinct, though related, issues both of which defendants incorrectly characterize as factually undisputed. Defendants have restricted plaintiffs to a narrow, 15-17 foot wide strip on a grassy area approximately sixty feet wide in front of stone walls denoting the main entrance to Vandenberg Air Force Base [VAFB] and reserve the "right" to similarly restrict plaintiffs to this narrow strip in the future. And, although defendants provided a suitable location for parking vehicles in conjunction with plaintiffs' May, 2001 rally, they have refused to commit to provide the same accommodation for future events. There are triable issues of material fact with respect to both issues; alternatively, if the facts are deemed undisputed, judgment must be entered in plaintiffs' favor, and not defendants', because (a) restricting expressive activity to a narrow strip of land making it impossible for participant to effectively speak and assemble in the absence of *any* military or public safety necessity is unconstitutional, and (b) defendants have shown by their past conduct that the provision of parking essential to meaningful assembly cannot be left to their whim. Finally, the procedural issues raised in the motion – standing and sovereign immunity – are also without merit.

First, defendants claim that the dispute over access to the grass area at the main entrance to VAFB turns on the location of a legal boundary denoting the right-of-way the federal government granted the County of Santa Barbara and State of California for road maintenance purposes. Plaintiffs disagree and argue below that that boundary line, where ever it might fall, is irrelevant to the First Amendment analysis. Assuming, however, the legal relevancy of the theory, a factual dispute exists as to its actual location: defendants claim that the "green line" painted on California Blvd. reflects the actual boundary; plaintiffs' evidence submitted herewith establishes that the line is further toward the Base entrance, closer to the stone walls thus increasing the concurrent jurisdiction area available for First Amendment activities. Alternatively, even if defendants have it right on this fact, their argument is utterly without merit because they have shown no reason whatsoever, whether public safety, military security, or any other basis, to justify restricting expressive activity on the grass area in front of the stone walls.

Second, the parking dispute turns not on whether the space provided is adequate (it is) but,

1   rather, on whether, in the absence of a firm commitment to make the space available in the future,

2   a judicial decree is necessary to ensure such access. If permission to park near the intersection is

3   withdrawn and the "no parking" signs remain, available parking is a mile away requiring a long trek

4   or transportation to the intersection. Because defendants have been unwilling or unable to honor their

5   past commitments regarding expressive activity at the site, and because they are unwilling or unable

6   to commit to provide suitable parking for future events, the "no parking" restriction is either invalid

7   or, alternatively, a factual issue exists with respect to whether a judicial decree is needed to guarantee

8   parking for future events. In either event, the motion with respect to the parking issue must be also

9   denied.

10                              **STATEMENT OF THE FACTS**

11          Defendants' factual statement reveals triable issues of material fact. Their fact summary

12   appears accurate in describing the various property transfers but they by no means establish

13   indisputably the physical location of the "green line" separating exclusive from concurrent

14   jurisdiction areas. Further, however, a number of important and dispositive facts are omitted.

15   Exhibits A and B illustrate the area in contention. Exhibit A reflects a broader view, showing the

16   entire intersection, and a portion of the public school along the right edge of the diagram. Exhibit

17   B shows the grass area on both sides of California Blvd. between the stone walls and

18   Lompoc/Casmalia Road-Highway 1 [hereafter referred to as "the site in question" or "the grass

19   area"]. Solomon Declaration. Crucial to defendants' argument is the right-of-way boundary line [also

20   referred to herein as the "green line"] which they claim separates the concurrent and exclusive

21   jurisdiction areas. This line is, according to defendants, reflected in a "green line" painted across

22   California Blvd. approximately seventeen feet in from the intersection, illustrated in Exhibit D. But

23   the documents submitted do not establish the physical location of that boundary line as an

24   indisputable fact. To the contrary, construction plans for the intersection prepared by State of

25   California engineers show that the right-of-way boundary is further away from the intersection than

26   the painted "green line." [Exh. C1 and C2].[1]

27   _____

28          [1] The markings depicting the "green line" and the stone walls on Exh. C2 are described by
     counsel in the Solomon Declaration.

For many years, Vandenberg Air Force Base [VAFB] has been a logical and appropriate site at which to protest American military policy; indeed, it is the *only* federal military installation along the Central Coast which has played a prominent role in implementing many controversial military programs such as the MX and Strategic Defense Initiative missile launches. [Booth Declaration] Sporadically up to 1988, Air Force officials allowed some expressive activity at the main entrance to the Base; at other times, otherwise protected activity would not be allowed anywhere within the federal reservation, regardless of how open or accessible to the public. Because VAFB became a favored site for expressing views contrary to official military policies, plaintiffs sued to gain access to a suitable site on which to stage their rallies. That action was settled, pursuant to which defendants agreed to allow peaceful First Amendment activities on the concurrent jurisdiction area on the grass. [Exh.E: Stipulation For Compromise Settlement and Order of Dismissal and "Statement of Policy" issued pursuant thereto; Solomon Declaration]. That "Statement of Policy" goes on to limit the Air Force's ability to curtail such activities only "when they materially interfere with or have a significant impact on the conduct of the military mission of the U.S. Air Force." [Exh. E, page 4].

Since that settlement, and until the events complained of in this action, defendants allowed peaceful First Amendment activity on the entire grass area [Booth Declaration and Exh. 1 thereto depicting demonstrators holding signs and picnicking on the grass area near one of the stone walls]. Either those activities were, indeed, within the concurrent jurisdiction area because the "green line" ran in the vicinity of the stone walls or they took place within both the exclusive and concurrent jurisdiction areas (if the "green line" is, in fact, further toward the intersection) without complaint from Air Force authorities. If the right to engage in expressive activities depends on the location of the "green line" (which plaintiffs dispute), a factual dispute exists as to the location of that line.

Until May, 2001, parking was allowed along the roadways adjacent to the intersection. The shoulder is wide [Exh. F], and plaintiffs are unaware of any negative incident involving parking such as accidents, brush fires, or other untoward events referred to in Col. Lanning's memo [Exh. 3 to Defendants' Motion for Summary Judgment]. Nevertheless, plaintiffs do concede that the parking provided at the public school and, when necessary, on the large grass area across from the public school, has been sufficient for their needs. Defendants have refused to commit themselves to provide

1   this parking in the future when needed [Solomon Declaration].

2

3   **I. PLAINTIFFS HAVE STANDING BECAUSE THE AREA RESTRICTION WILL**

4   **BE IMPOSED ON FUTURE EVENTS WITHOUT FACTUAL BASIS AND THOSE**

5   **RESTRICTIONS PREVENT PLAINTIFFS FROM MEANINGFULLY EXERCISING**

6   **THEIR RIGHTS OF FREE SPEECH AND ASSEMBLY.**

7   The essence of the standing requirement requires legal "injury" to a plaintiff. Thus, plaintiffs'

8   actions are routinely dismissed when, for example, they attempt to assert violations of the rights of

9   third persons not before the court. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789,

10  797 (1984) (affirming the general rule "that a litigant only has standing to vindicate his own

11  constitutional rights."). Here, as demonstrated by plaintiff Booth in his Declaration, restricting

12  people to a narrow, 15-17 foot wide strip prevents them from staging an effective rally where they

13  can hear and see the speakers, ask questions, and generally experience the other participants as part

14  of a group that shares common views. And, should defendants refuse permission for participants to

15  park on the shoulder across the street from the intersection, people wishing to express their rights

16  would have to park at least one mile away and either walk to the intersection or somehow be

17  transported to the location.

18  Thus, plaintiffs herein are in precisely the same position as the plaintiffs in numerous other

19  cases where standing was held satisfied. See, e.g., *Singleton v. Wolff*, 428 U.S. 106, 117 (1976)

20  (physicians have standing to challenge state limits on abortion funding because the cutbacks will

21  tangibly interfere with their medical practices); *Joint Anti-Fascist Refugee Committee v. McGrath*,

22  341 U.S. 123, 140-41 (1951) (plaintiffs had standing to challenge their involuntary designation as

23  communist organizations by the Attorney General). Plaintiffs also have standing to enforce the

24  settlement agreement reached in the earlier litigation because they are closely allied to parties thereto.

25  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975) ("A well-settled line of authority

26  from this Court establishes that a consent decree is not enforceable directly or in collateral

27  proceedings by those who are not parties to it even though they were intended to be benefitted by

28  it.").

4

1   Defendants, in fact, collapse the standing requirement with the merits. They argue that

2   because the 15-17 foot strip is adequate for expressive activity and that adequate, alternative parking

3   has been provided for protest events at the intersection, the plaintiffs lack standing to challenge either

4   restriction. But this argument assumes the outcome. The precise issue is whether defendants can

5   prevent plaintiffs from staging effective rallies and whether a judicial decree is necessary to

6   guarantee suitable, alternative parking for future events. Plaintiffs assert that the restrictions,

7   including the defendants' refusal to commit to provide suitable, alternative parking for future events,

8   burdens them in the meaningful exercise of their constitutional rights. Whether they win on the

9   merits or not, surely they are entitled to bring those claims before the court for adjudication.

10

11   **II. THE COURT DOES HAVE SUBJECT MATTER JURISDICTION OVER THE**

12   **DEFENDANT U.S. AIR FORCE AS AN AGENCY OF THE UNITED STATES**

13   Congress has waived the sovereign immunity of agencies of the United States Government

14   in all cases seeking equitable relief, as here. *Sheehan v. Army & Air Force Exchange Service*, 619

15   F.2d 1132, 1139 (5th Cir. 1980), rev'd on other grounds, 456 U.S. 728 (1982); *Church of Scientology*

16   *v. Linberg*, 529 F. Supp. 945, 969 (C.D. Cal. 1981) (and cases cited therein). This result is compelled

17   by the clear language of "[t]he 1976 amendment to [5 U.S.C. section 702 which] waives sovereign

18   immunity for actions against federal government agencies seeking non-monetary relief, if the agency

19   conduct is otherwise subject to judicial review." *Sheehan, supra* at 1139. Section 702 states:

20   A person suffering legal wrong because of agency action, or adversely affected or

21   aggrieved by agency action within the meaning of a relevant statute, is entitled to

22   judicial review thereof. An action in a court of the United States seeking relief other

23   than money damages and stating a claim that an agency or an officer or employee

24   thereof acted or failed to act in an official capacity or under color of legal authority

25   shall not be dismissed nor relief therein be denied on the ground that it is against the

26   United States or that the United States is an indispensable party. The United States

27   may be named as a defendant in any such action, and a judgment or decree may be

28   entered against the United States: Provided, That any mandatory or injunctive decree

shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

Thus, defendants' sovereign immunity argument lacks merit. It is also a non-issue because plaintiffs have offered to dismiss the Air Force from the action if defendant Worley would stipulate that he would have full authority to implement any and all relief that may be ordered on the merits. Defendants refused to so stipulate. It is, therefore, entirely appropriate to retain the agency as a defendant to ensure that any relief ordered is implemented.

**III. DEFENDANTS' MOTION BASED ON THE AREA RESTRICTIONS MUST BE DENIED BECAUSE THE PHYSICAL LOCATION OF THE BOUNDARY LINE IS A MATERIAL ISSUE IN DISPUTE AND, ALTERNATIVELY, DEFENDANTS HAVE FAILED TO SHOW THAT RESTRICTING EXPRESSIVE ACTIVITY TO A NARROW STRIP AT THE MAIN ENTRANCE IS JUSTIFIED BY MILITARY OR OTHER NECESSITY OR LEAVES OPEN AMPLE ALTERNATIVE METHODS OF COMMUNICATION**

**A. Both Sides Have Introduced Sufficient Evidence to Support Their Respective Contentions as to the Physical Location of the "Green Line"**

Defendants argue that the physical location of the "green line" is dispositive and that that line has been properly located some 17 feet from Highway 1 across California Blvd. Although the precise location of the line separating exclusive from concurrent jurisdiction is constitutionally irrelevant, nevertheless, on the terms of defendants' argument, a triable issue of fact exists as to its precise location. The evidence clearly establishes that the location is in dispute. The painted "green line" terminates at the curbs on both sides of California Blvd. in the middle of the arc, as illustrated in Exhibit D. The construction drawing of the intersection prepared by engineers for the California

Department of Transportation [Exh. C1], shows the "R/W" or right-of-way (i.e., the line separating exclusive from concurrent jurisdiction areas or "green line") across California Blvd. at a point where the opposite curbs are parallel with each other, that is, not at the arc of the curb but further to the west, toward the guard station. Exhibit C2 thus shows that the "green line" is, indeed, located at or close to the stone walls on both sides of the intersection.

Summary judgment, of course, is not available when a material fact remains in dispute. For example, in a recent case, the Forest Service demonstrated that it had administered certain forest study areas to maintain their wilderness character and potential, while the plaintiffs' evidence showed the opposite. *Montana Wilderness Association, Inc. v. United States Forest Service*, 2003 U.S. App. Lexis 73, 2003 Daily Journal D.A.R. 202 (9th Cir., 2003) (reversing district court's grant of summary judgment). Here, both parties have introduced evidence supporting their respective contentions, although plaintiffs and the court would have to make a leap of faith and accept defendants' interpretation of the metes and bounds descriptions in Exhibit A to Exhibit 5 as supporting their contention.[2] Even granting the defendants that leap of faith, a triable issue of fact remains, and motion must be denied.

**B. Alternatively, Regardless of the Position of the Right of Way Line, First Amendment Activity Must be Allowed on the Grass Area Because it is a Public Forum and the Area Restriction is not Narrowly Tailored to Leave Open Ample Alternatives to Communicate and Assemble**

**1. *The Grass Area in Dispute is a Public Forum***

Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thought between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

---

[2] It is just as plausible that following the metes and bounds description in detail will produce the same right-of-way line reflected in CalTrans' construction drawing [Exh. C]. Regardless, without expert testimony interpreting those metes and bounds, defendants have failed their burden to establish a fact essential to their theory.

1  *Hague v. Comm. for Industrial Organization,* 307 U.S. 496, 515 (1939) (opinion of Roberts, J.).

2      Defendants' motion must be denied even if the court concludes that the "green line" is

3  located where defendants claim it is located. This conclusion is compelled because the grass area is

4  a public forum and the area restriction is not narrowly tailored to provide for any alternative method

5  of staging a minimally effective rally. The rule the court must apply is well settled:

6          In evaluating an as applied First Amendment challenge, we must decide whether or

7          not the plaintiff's activities are protected speech or conduct, whether the government

8          restriction occurs in a public or non-public forum, and whether or not the restriction

9          is a valid time, place or manner regulation [citation]. [If the activity is protected and

10          the area in question is a public forum] [A] valid time, place or manner restriction .

11          . . must (1) be content-neutral, (2) narrowly tailored to serve a significant government

12          interest, and (3) leave ample alternatives of communication. [citations]

13  *Gerritson v. City of Los Angeles,* 994 F.2d 570, 576 (9th Cir. 1993).[3]

14      In a factually identical setting, the Supreme Court has ruled that areas within open military

15  installations and that are akin to streets, sidewalks and parks are public forums. *Flower v. United*

16  *States,* 407 U.S. 197 (1972). In *Flower,* the plaintiff was cited for distributing leaflets on the

17  sidewalk on a public street which ran through Ft. Sam Houston. The street was open to the public

18  at all times of night and day, no sentry or guard was posted anywhere along the street, and the street

19  was "an important traffic artery used freely by buses, taxi cabs and other public transportation

20  facilities as well as by private vehicles." Id. at 198. The Court held:

21          Under such circumstances the military has abandoned any claim that it has special

22          interest in who walks, talks, or distributes leaflets on the avenue. The base

23          commandant can no more order petitioner off this public street because he was

24          distributing leaflets than could the city police order any 'leafletter' off any public

25          street.

26

27  ———————————

    [3] "Defendants acknowledge that plaintiffs have engaged in protected speech."

28  Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 8, n. 2.
    Plaintiffs acknowledge that the area restriction is content-neutral.

1  Id. Highway 1 and the Lompoc-Casmalia Road are identical to the road through Ft. Sam Houston:
2  they are open to the public at all times of night and day, the traveling public uses them freely without
3  passing through any sentry or guard stations, and their use by the public poses no risks to the
4  surrounding military facilities.

5      Plaintiffs, of course, do not dispute the importance of a "green line" somewhere, nor do they
6  seek access to the Base itself or restricted areas within the Base. Nor are they seeking to exercise
7  their First Amendment rights on the Base proper when the public is otherwise invited onto the Base
8  on special occasions. The sole issue in this action is access to the grass area between the stone walls
9  and Highway 1, a park-like setting adjacent to a public, unregulated thoroughfare. Thus, every case
10 cited by defendants in their motion dealing with access to military installations is factually
11 distinguishable. For example, the plaintiffs in *Greer v. Spock*, 424 U.S. 828 (1976), sought to engage
12 in partisan political campaigning on a parking lot within the confines of Ft. Dix which was actively
13 patrolled and controlled by military authorities and where the ban on political campaigning of all
14 kinds was justified:

15      What the record shows, therefore, is a considered Fort Dix policy, objectively and
16      evenhandedly applied, of keeping official military activities there wholly free of
17      entanglement with partisan political campaigns of any kind. Under such a policy
18      members of the Armed Forces stationed at Fort Dix are wholly free as individuals to
19      attend political rallies, out of uniform and off base. But the military as such is
20      insulated from both the reality and the appearance of acting as a handmaiden for
21      partisan political causes or candidates.

22 Id. at 839. Similarly, the protesters in *United States v. Albertini*, 472 U.S. 675 (1985), and *Persons*
23 *for Free Speech at SAC v. U.S. Air Force*, 675 F.2d 1010 (8th Cir. 1982), attempted to distribute
24 literature on otherwise restricted military bases that had merely been opened for the day to the public.
25 *Shopco Distribution Co. v. Commanding General, etc.*, 885 F.2d 167 (4th Cir. 1989) and *M.N.C. Of*
26 *Hinesville v. U.S. Dep't of Defense*, 791 F.2d 1466 (11th Cir. 1986), both involved distribution of
27 commercial advertising newspapers on military bases not open to the general public. The facts in
28 *United States v. DeMott*, 151 F. Supp. 2d 706 (E.D. Va. 2001), superficially resemble the facts of

9

1   the instant case, but the protesters there did not argue that the concurrent jurisdiction area was too

2   small to permit them to hold an effective and meaningful rally. Plaintiffs in this case, however, have

3   demonstrated that the 15-17 foot strip has that precise impact. *Hale* and *McCoy* are also

4   distinguishable. Although the roadway in *Hale v. Dep't of Energy*, 806 F.2d 910 (9th Cir. 1986), was

5   "open" to the public, it was a dead-end road into and out of the Nevada nuclear test site, was heavily

6   patrolled, and clearly not "dedicated" to First Amendment activity. And Ms. McCoy tried to

7   distribute literature in the middle of a street constituting the driveway to a military base and within

8   a restricted area (on the Base side of a "green line").

9       The facts in the instant action more closely resemble those in *Flower, supra, CCCO-Western*

10  *Region v. Fellows*, 359 F. Supp. 644 (N.D. Cal. 1972), involving access to a major thoroughfare on

11  the Presidio Military Reservation in San Francisco, and *United States v. Gourley*, 502 F.2d 785 (10th

12  Cir. 1973), involving access to the area surrounding the football stadium and chapel on the grounds

13  of the Air Force Academy, all of which held that those locations were pubic forums . The major

14  traffic arteries (and abutting sidewalks and grass buffers) through Ft. Sam Houston, the Presidio, and

15  Vandenberg Air Force Base, and the public areas around the football stadium and chapel at the Air

16  Force Academy all share two constitutionally significant, identical characteristics: the public has

17  open access to them and that open public access in no way threatens or jeopardizes any legitimate

18  security interest or military discipline.

19      In contrast, the "protest cases" cited by defendants would pose such risks if the courts

20  accepted the protesters' argument and held that the area in question was a public forum. For

21  example, if the sidewalks surrounding the Pentagon were considered public forums, potential

22  terrorists or people bent on obstructing visitors and legitimate defense business would be at a

23  significant advantage in getting to their intended target undetected. And if protesters could distribute

24  literature on a military base open to the public on one day a year or conduct partisan political

25  campaigns on restricted areas, the potential for disrupting military discipline is clear.

26      But none of these concerns are present when the military authorities allow major

27  thoroughfares through their installations and thus, as long as the roads are allowed to remain, have

28  signaled their belief that the resulting public access will not threaten the military mission. This is

what the Supreme Court in *Flower* meant by concluding that the commanding officer of Ft. Sam Houston "abandoned" the ability to restrict First Amendment rights on the major roadway through the base: "in being 'open' the base was quasi-public, in the sense that rigid security protection was not thought necessary; the commander's restrictions on speech were not prompted by a legitimate concern for the internal security of the base." *CCCO-Western Region v. Fellows, supra* at 649. There is no difference, in constitutional terms, between the public roadways, adjacent sidewalks and abutting park-like areas that bisect Vandenberg Air Force Base, the Presidio, Ft. Sam Houston, and the areas surrounding the football stadium and chapel at the Air Force's own Academy in Colorado. The authorities in each case have, by their conduct, demonstrated that no special security concerns exist along those thoroughfares (other, of course, than the usual safety and other concerns attendant with any roadway). One cannot imagine, therefore, a more quintessential place for constitutionally protected activity.

> ### 2. *Plaintiffs Have Shown That the Restriction Unduly Interferes With Their First Amendment Rights and Defendants Have Not Shown That its Complete Ban on First Amendment Activity on the Grass Area in Front of the Stone Walls is Narrowly Tailored to Achieve a Significant Government Interest*

Plaintiffs cannot and do not challenge the Air Force's right, and duty, to safeguard VAFB proper from wrongdoing of any sort, including acts of civil disobedience, to ensure Base security and military discipline among its troops. Nevertheless, as in institution still subject to the law of the land as interpreted by the judiciary, it must demonstrate, and not merely claim in the abstract, what significant interest it actually has in the real world to justify restricting First Amendment activity in a public forum regardless of the right-of-way line.

As established by the attached declaration of plaintiff Booth, restricting expressive activity to a narrow, 15-17 foot strip prevents the participants from gathering together to hear the speakers and from meaningfully assembling as a group. This is also demonstrated by defendants' own evidence, specifically, the two photographs attached to the Miranda Declaration. Both show a relatively small contingent of people squeezed into the narrow strip between the barricade fencing and the street. That strip would, indeed, be sufficient for small gatherings and for a picket line. But

1  it would be utterly inadequate for a large gathering involving hundreds of people who typically want
2  to listen to and ask questions of speakers as well as be present to bear witness and express their
3  views. In the same vein, plaintiffs' evidence shows that the entire grass area between the street and
4  the large stone walls is suitable for expressive activity, and is far enough away from the manned
5  sentry station and visitor center to allow for an immediate response to any attempted trespassing onto
6  the Base without jeopardizing military security, people's safety, or property. Colonel Lanning
7  estimates the distance between the defendants' "green line" and the main gate to be approximately
8  160 yards. Lanning Declaration in Support of Motion for Summary Judgment at 19, line 17. That
9  would put the distance between the main gate and the stone wall at approximately 145 yards.
10  Defendants do not contend that a 145 yard security buffer zone would be materially less secure than
11  one 15 yards wider.

12      In fact, defendants' moving papers are utterly devoid of even a hint of an explanation as to
13  why moving the restricted area outward some 15 yards (that is, from the stone walls toward the High
14  way) is necessary for base security or military discipline. Colonel Lanning provides the only
15  justification, but only for *a* green line:

16      "[t]he snow fencing serves several purposes, including serving as a clear visual delineation
17      for the protestors and law enforcement as to what constitutes exclusive federal jurisdiction.
18      Further, the fencing identifies a point for law enforcement as far as which agency
19      arrests/detains individuals for various offenses and which agency has responsibility for crowd
20      control and security for VAFB. I directed that the snow fencing be erected to assist in
21      preventing trespassing which is a threat to the security of VAFB and its mission."

22  Lanning Declaration in Support of Motion for Summary Judgment, p. 21, lines 11-16. Thus, the *only*
23  purported justification is that everyone involved needs to know where the line between protected
24  activity and trespassing is. Fair enough; knowing the physical location of the enforcement point is
25  a significant government interest. But the stone wall would serve precisely the same function. In
26  other words, the defendants have chosen a physical location for the green line justified only by the
27  need to have a clear line. And, they made that decision when the same clear demarcation would far
28  more easily be provided by the permanently installed stone walls, which would also preserve the

1  grass area for minimally effective rallies. Defendants do not claim that using the stone walls as the

2  demarcation line would threaten the security of the Base or increase the risk of injury to military

3  personnel or civilians or property. Indeed, such a claim would be ludicrous on the facts. The manned

4  sentry gate and visitors' center are approximately 140 *yards* from the stone wall, so allowing the

5  additional 40 feet or so for expressive activity would not threaten any significant interest.

6      This is demonstrated by the use of the grass area following settlement of a similar dispute

7  between the same parties in 1989. As a result of that litigation, defendants agreed to allow peaceful

8  expressive activity on the "concurrent jurisdiction" site on both sides of the intersection and

9  committed themselves to restrict this activity only when "they materially interfere with or have a

10  significant impact on the conduct of the military mission of the U.S. Air Force." [Exh. E] Soon after

11  the settlement, Base command, to their credit, allowed peaceful gatherings on the entire grass area

12  between the stone walls and the Highway. [Booth Declaration and Exh.1 thereto] Apparently, with

13  a change in command, came a different attitude toward First Amendment activity at the site and the

14  decision to restrict protected activity which resulted in the instant litigation. But there was not a

15  problem with peaceful rallies and demonstrations on the grass area from 1989 through 2001. During

16  that period, a few individuals were arrested for trespassing when they, in public acts of civil

17  disobedience, walked down California Blvd. over the painted green line [Booth Declaration], thus

18  illustrating that everyone knew where the green line was for purposes of geographically separating

19  protected conduct from trespassing.

20      Case law supports plaintiffs' contention that the ban on First Amendment activity is not

21  narrowly tailored to achieve a significant government interest. Although the need to have a clear line

22  of demarcation is a significant interest, it must nevertheless be narrowly tailored to achieve that goal.

23  In *Gerritson v. City of Los Angeles*, 994 F.2d 570 (9th Cir. 1993), the City prohibited distribution of

24  all handbills in certain portions of El Pueblo de Los Angeles State Historic Park. The court held that

25  the total ban on distribution did not meet the "narrowly tailored" test because the ban

26      is no more necessary for the maintenance of peace and tranquility on the sidewalks

27      surrounding the [Mexican Consulate and Olvera Street merchant area] than on any

28      other sidewalks in the city . . . [and] the blue-line areas [*i.e., where distribution is*

1    *prohibited*] are indistinguishable from other parts of the park. Nor is there evidence

2    that Gerritson's handbill distribution interfered with operation of these park areas.

3    Id. at 577. This rationale fully applies here. The grass area that defendants claim is within the

4    concurrent jurisdiction area is indistinguishable from the rest of the grass area in front of the stone

5    walls, and there is no evidence whatever that allowing peaceful First Amendment activity on that

6    grass area in any interferes with the functioning of the installation.

7            The point here is simply that defendants' argument confuses the need for *a* demarcation line

8    with Base command's desire to locate that line in its present location. The issue becomes whether

9    the obvious need for a demarcation line can be reconciled with plaintiffs' effective exercise of their

10   constitutional rights. As demonstrated in the next section, the answer is clearly yes.

11           **3. The Area Restriction Fails to Provide Any Alternative Forum for the**

12           **Meaningful Exercise of the Rights of Speech and Assembly**

13           The area restrictions fail the last element of the test because there is no where else to stage

14   a minimally effective rally in the vicinity of the main entrance. Defendants claim they can prohibit

15   all expressive activity on the reservation except on areas of concurrent jurisdiction. This area

16   amounts to a 15-17 foot wide strip on the grass and sidewalk along the Highway, and is probably

17   similarly narrow along the entire right-of-way. Thus, defendants' argument essentially would ban

18   all peaceful rallies involving more than a hundred people or so on the entire reservation. This

19   stunning restriction could only be justified in the face of the most compelling reasons, yet, as

20   illustrated above, no such reasons exist.

21           Courts have upheld the meaningful exercise of First Amendment rights in a wide variety of

22   circumstances. Thus, the Ninth Circuit has struck down a local ordinance prohibiting carrying signs

23   attached to wooden or plastic handles because it did not allow for ample alternative means of

24   communication. *Edwards v. City of Coeur D'Alene*, 262 F.3d 856, 866-67 (9th Cir. 2001). The court

25   reasoned that the demonstrators had to use the handles to communicate their message to a broad

26   audience during a public assembly by having to hoist their signs high in the air. A total ban on

27   demonstrations in Gracie Park across the street from the New York Governor's mansion was struck

28   down in *New Alliance Party v. Dinkins*, 747 F. Supp. 1055 (S.D. N.Y. 1990): "The court views the

1   advantage presented by the [park] as a rally site as a cognizable First Amendment interest." Id. at

2   1067.

3         Similarly, in *Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990), the court

4   struck down a 75 yard security zone around a Navy pier as unduly restrictive because the audience

5   on the pier could not read the protesters' banners or see or hear their speakers. The court also held

6   that the government has the burden of proving that the restriction is narrowly tailored and leaves

7   open ample alternatives. Equally important, "whether an alternative is ample should be considered

8   from the speaker's point of view." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002).

9         Defendants claim, without a shred of factual or legal support, that a 15-17 foot wide strip is

10  sufficient to stage an effective rally involving more than a hundred participants. Coming from the

11  government that is charged with protecting its citizens' rights, and with a history replete with

12  examples of the importance of public rallies and assemblies on the great issues of the day, this is an

13  astoundingly naive assertion. It should be rejected. Put simply, the defendants' insistence on

14  squeezing all protected activity into a narrow strip of land amounts to a prior restraint on protected

15  speech and assembly and should not be sanctioned.

16

17  **IV. PLAINTIFFS ARE ENTITLED TO A DECREE PRESERVING ACCESS TO A**

18  **SUITABLE AREA FOR PARKING PURPOSES NECESSARY TO ALLOW PEOPLE**

19  **TO MEANINGFULLY EXERCISE THEIR FIRST AMENDMENT RIGHTS AT THE**

20  **SITE**

21        Plaintiffs' need for parking to meaningfully exercise their First Amendment rights is

22  unquestioned by defendants. Indeed, the fact that they provided parking on federal land across the

23  street from the public school after prohibiting parking along the shoulder of the adjoining highways

24  attests to this. The issue is whether the parking dispute is moot or whether a judicial decree is

25  necessary to guarantee similar access for future events.

26        First, there is no doubt that future events are planned. Plaintiff Booth's Declaration makes

27  clear that VAC intends to continue staging events at the site twice a year and that, from time to time,

28  significantly more people will arrive than can be accommodated in the public school parking lot.

1   Second, the defendants have twice reneged on their promises with respect to protected activity on

2   "their" property. They allowed First Amendment activity on the entire grass area between the

3   Highway and the stone walls following the 1989 settlement, but then barred that activity in May,

4   2001. And, in spite of explicit permission being given to present counsel and plaintiff Booth to

5   briefly remain on restricted land by the public school to gather necessary information, they have both

6   been cited for trespassing, even though they entered the area unaware that it was a restricted area,

7   intended no wrongdoing while entering or during their brief stay there, and, most important, received

8   explicit authorization from the Base Legal Office to be there. Solomon and Booth Declarations.

9   Plaintiffs reasonably fear that defendants will prohibit parking on a similarly arbitrary basis.

10

11                             **CONCLUSION**

12         For the foregoing reasons, the motion must be denied and the action allowed to proceed to

13   trial on the merits. Alternatively, if the court determines that no triable issue of material fact exists,

14   the court should deny judgment for defendants and, instead, enter judgment for plaintiffs on the

15   merits and grant the relief prayed for.

16

17   Respectfully submitted,

18   Dated: January 21, 2003               ZIMMER & MARCUS, LLP

19

20                       By: _____

                              Richard C. Solomon

                              Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

BOOTH DECL.

DECLARATION OF ELDEN BOOTH

1

2    I am a plaintiff in the within action. I know all of the facts stated in this declaration of my

3    own knowledge and could testify competently thereto except those stated on my information and

4    belief, and, as to those facts, I believe them to be true.

5    I am a retired engineer, a combat veteran of World War II, and a peace activist. I live in Los

6    Olivos, a small community in the northern part of Santa Barbara County. I have been part of the

7    Vandenberg Action Coalition [VAC] since its formation in early 1983, in response to the

8    government's decision to test the MX missile at Vandenberg Air Force Base [VAFB]. VAC consists

9    of a number of organizations, such as the Quakers and Green Party, and individuals all of whom

10   agree on the need to prevent the deployment of weapons in space and the dangers of militarism (a

11   foreign policy dominated by military, as opposed to diplomatic and peace-oriented, considerations).

12   VAC began trying to stage peaceful rallies and demonstrations on the grass area adjacent to the main

13   entrance to VAFB but were refused by Air Force authorities. For many years, we held our rallies

14   along the highways at the edge of the federal reservation. Air Force authorities arrested anyone who

15   stepped over the property line, citing them for trespassing. VAFB is an important site because it is

16   where several controversial military initiatives, such as the MX missile tests, have been and will be

17   carried out.

18   In 1988, a number of individuals affiliated with VAC sued the then Base Commander and

19   the United States Air Force in the Central District (case no. CV 88-05677 AWT). My present lawyer,

20   Richard Solomon, also represented the plaintiffs in that action. The case was settled in 1989 after

21   the defendants agreed to allow peaceful rallies and demonstrations on the grass area at the main

22   entrance intersection. Since then, VAC has staged regular demonstrations at the site which have

23   taken place on the grass area between the stone walls and the sidewalk abutting the Highway. Two

24   photographs attached to this declaration as Exhibit 1 and 2 show a gathering of people on the grass

25   area taking a break during a rally and a four demonstrators holding a banner. Thus, after 1989, we

26   thought that the line between exclusive federal jurisdiction and concurrent jurisdiction ran along the

27   stone walls depicted in the photographs, and we regularly held peaceful rallies and demonstrations

28   on the entire grass area. All of our events have been peaceful; the only conduct which could be

1

1  considered criminal consisted of an occasional act of peaceful civil disobedience when a relatively

2  few number of demonstrators crossed into exclusive federal jurisdiction area and were cited for

3  trespassing. To my knowledge, no person affiliated with VAC has ever damaged Air Force property

4  or injured anyone associated with VAFB, or threatened to do so.

5     Since 1989, VAC has organized rallies at the main entrance in May and October of each year

6  (May coinciding with Armed Forces Day and October with a national day of protest against

7  militarism). Periodically, VAC makes a particularly vigorous effort to encourage people to attend

8  an event, in which case upwards of 200 or more people show up. For such events, we have always

9  given Air Force authorities advance notice to avoid conflicting access to the grass area and to ensure

10  that the Air Force would not accuse us of surprising them with a big event for which they were

11  unprepared. People arriving first would typically park their cars in the public school parking across

12  the intersection from the main entrance. Others would park on the shoulder of the Highway in either

13  direction from the main entrance. As far as I know, there was never a problem with traffic, fires, or

14  other problems caused by the occasional parking of vehicles on the shoulder of the Highway.

15     VAC planned a large event for May 2001. Barricade fencing had been erected across the

16  grass area and "no parking" signs had been put up along the Highway for approximately one mile

17  in each direction from the main entrance. We were, however, directed to park by law enforcement

18  officers (California Highway Patrol, I believe) on a large strip of land along Mountain View Blvd.

19  across the street from the public school and very near the site. This parking arrangement worked

20  well. However, we were only allowed to stage our rally in a narrow portion of the grass area. I did

21  not measure the distance and have since been told that Air Force authorities claim that the width of

22  that strip of land was 17 feet, which seems accurate. Almost 300 people participated in this event.

23  The fact that the participants were stretched out along a 17 foot wide stripe of land made it

24  impossible to have a rally where all participants could hear the speakers and gather together around

25  the speakers' platform.

26     Similar events have been held in October, 2001, and in May and October of 2002. On each

27  occasion, the Air Force installed the barricade fencing across the grass area and kept protesters

28  within the strip of land between that fencing and the Highway.

1         The sentry gate at the main entrance to VAFB is approximately 400-500 feet away from the

2   stone walls which transect the large grass areas on both sides of the intersection, and there are no

3   other obstructions or structures between that gate and the stone walls. I estimate the width of the

4   grass area between the stone walls and the Highway to be approximately 55-60 feet, which is enough

5   space for the participants to gather around the speakers' platform and actually hear the speakers, hear

6   questions put to the speakers and ask questions themselves.

7         Parking will not be a problem as long as the authorities allow participants to park along

8   Mountain View Blvd. I am worried, however, that permission to park there may be withdrawn and

9   that no viable alternatives will be provided. Although the barricade fencing was removed after the

10  April, 2001 event, my lawyer informs me that, in a letter from an Air Force attorney, the Air Force

11  reserves the "right" to put up the barricade fencing "as appropriate." Because we had access to the

12  entire grass area between 1989 and April, 2001, which has been unilaterally revoked, I am worried

13  that the same permission to park along Mountain View Blvd. could be similarly revoked. If it was

14  revoked, and the parking restrictions along the Highway were enforced, participants would have to

15  park more than one mile from the intersection and either have to walk that far to the site or be

16  transported to the site. This would be a tremendous burden on the organizers of a large event because

17  it would necessitate spending scarce funds on buses or vans and coordinating the picking up and

18  dropping off of scores of participants. I am certain that many people simply would not attend the

19  event if relatively convenient parking was not available.

20        On December 2, 2002, I went to the intersection at Mr. Solomon's request so that we could

21  gather factual information that we needed to answer defendants' interrogatories. I met Mr. Solomon

22  across from the public school on Mountain View Blvd. which the Air Force claims to be a restricted

23  area even though students, teachers and staff at the public school, and others, traverse that road every

24  day school is in session. After a discussion with Base security officers, Mr. Solomon told me that

25  a legal officer had given the two of us permission to be at that location to finish our investigation.

26  Nevertheless, in spite of this permission, I received a citation in the mail three days later for

27  trespassing on December 2 and a second citation for being in a restricted area having earlier received

28  a "bar" letter that was still in effect. Thus, it makes me sad to say, I am reluctant to trust Air Force

1 | authorities who seem to change their mind when it suits them.

2 | I declare under penalty of perjury that the foregoing is true and correct, and that I executed

3 | this declaration on January 20, 2003, at Santa Barbara, California.

4

5

6 | ELDEN BOOTHE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4





Ex H.
1, 2

SOLOMON DECL.

### DECLARATION OF RICHARD C. SOLOMON

1        I am a lawyer, duly licensed to practice in California, the Central District of California, and
2 in the Ninth Circuit. I am counsel of record for plaintiffs in the within action. I know all of the facts
3 stated in this declaration of my own knowledge and could competently testify thereto.   I also
4 represented four individuals affiliated with the Vandenberg Action Coalition in an action filed in the
5 Central District of California against Colonel Ronald D. Oliverio, then serving as Base Commander,
6 and the United States Air Force as an agency of the United States, challenging the defendants'
7 prohibition of any constitutionally protected activity on the federal reservation.

8        That action settled in 1989 with defendant Oliverio issuing a "Statement of Policy"
9 recognizing the concurrent jurisdiction area on the grass between the stone walls and the Highway
10 as appropriate for first amendment activity. A true and correct copy of that "Statement of Policy" is
11 attached to plaintiffs' Opposition Brief as Exhibit E. The parties did not further define or describe
12 the limits of the concurrent jurisdiction area at that time.

13        I filed the instant action in 2001. In November of 2002, defendants served a set of
14 interrogatories and requests for admission on plaintiffs which required me to ascertain certain facts
15 such as the number of parking spaces at the public school across the street from the main entrance
16 to the Base and the distance from the parking area provided to participants in the May, 2001 protest
17 demonstration. I did not obtain advance permission to "enter" the Base for this purpose because I
18 assumed that the area around the public school was not a restricted area, i.e., not part of the Base
19 closed to the public. While there with Mr. Booth (who I needed to be present to point out landmarks
20 and locations relevant to the instant action), military police approached and, even though I explained
21 why I was there, ordered me to leave. Eventually, I spoke with a Captain Selle of the Base Legal
22 Office, explained why I and Mr. Booth were present, and he authorized us to remain and complete
23 our fact investigation. He apparently conveyed this to the military police officer who then left. We
24 completed our investigation and left the area without incident. In spite of the authorization I had
25 received from Captain Selle, Mr. Booth and I received a citation for misdemeanor trespassing in the
26 mail three days later, a charge which is pending.

27        In conjunction with the instant lawsuit, I asked the State of California to produce records

1 relating to construction at the intersection in question pursuant to the California Public Records Act.

2 I was eventually sent a set of construction plans, a true and correct copy of a page from which is

3 attached to plaintiffs' Opposition Brief as Exhibit C1. It is reduced in size from the original drawing

4 but is otherwise an exact copy. On an identical copy [Exh. C2] I have drawn a green line across

5 California Blvd. as close to its actual location on the pavement as could be depicted. I have also

6 drawn in the stone walls, marked with the letters "SW". While at the intersection on December 2,

7 2002, I took the two photographs depicting the green line across California Blvd. and one of the two

8 stone walls on the South side of the intersection; Exhibit D is a true and correct copy of those

9 photographs. I also paced off the distance between the edge of the curb along Highway 1 and an

10 extension of the painted green line across the grass area; that paced-off distance measured fifteen

11 feet.

12 A photograph of the shoulder along Highway 1 about a mile from the intersection is attached

13 as Exhibit F. Mr. Booth told me he took that photograph soon after the "no parking" signs were

14 installed. I inspected the scene and can attest that the photograph accurately depicts it. Similar "no

15 parking" signs have been installed for about one mile in each direction from the main entrance on

16 Highway 1 and Lompoc-Casmalia Road. At the point depicted in Exhibit F, I estimate the shoulder

17 to be at least thirty feet wide.

18 In discussions with counsel for the defendants, I have expressed willingness to abandon the

19 allegations with respect to the parking restrictions if defendants commit in writing to provide suitable

20 parking for the larger events (i.e., events involving more participants than can park on the public

21 school lot). To date, they have refused to do so. In response to counsel's request to dismiss the

22 United States Air Force as a defendant, I offered to do so if Colonel Worley would agree in writing

23 that he was authorized to carry out any and all relief that may be ordered by the court should

24 plaintiffs prevail on the merits. I received no response to this offer.

25 I declare under penalty of perjury that the foregoing is true and correct and that I executed

26 this declaration on January 20, 2003, at Santa Barbara, California.

27

28

RICHARD C. SOLOMON

**EXHIBIT A**

AB5800 etc.

NO PARKING SIGNS   J 640



ATTACHMENT A          w          May

**EXHIBIT B**



**TRANSPORTATION**   ACF-P001 (275)

# CONSTRUCTION ON
# IGHWAY
**BARA COUNTY**
**HARRIS GRADE ROAD**
**OMPOC-CASMALIA ROAD**
d Plans dated January, 1988

## LOCATION MAP

VANDENBERG AIR FORCE BASE

**END CONSTRUCTION**
**STA. "VB RD." 30+00.00 PM 30.0**

"A-R" 380+21.62 =
"VB RD" 25+23.76

"P" 358+00.00 LI=
"A-R" 358+00.00

"P" 299+00.00 LI=
"A-R" 299+00.00

LOMPOC CASMALIA RD.

250   ROUTE 1

350

300

74+27.86 LI Bk=
74+27.86 Ahd

End Work
Sta. "VB RD." 45+45

As Builts Reviewed
With Res. Engr.
By
Date   June 4, 1993

**AS BUILT PLANS**
Contract No.   05-334504
Resident Engineer
Date   4/21/12

Larry R. Thomas, Project Manager
REGISTERED CIVIL ENGINEER

**March 18, 1991**
PLANS APPROVAL DATE

REGISTERED PROFESSIONAL ENGINEER
LARRY R. THOMAS
No.   41606
Exp. 12-31-91
CIVIL
STATE OF CALIFORNIA

CENTENNIAL CIVIL ENGINEERS, INC.
303 HEGENBERGER ROAD, SUITE 205
OAKLAND, CALIFORNIA  94621

| Contract No. | **05-334504** |
| CU   05253 | EA   05-334501 |

849 TITLE/6-8-90

INDEX SHEETS

| Sheet No. | 1 | Title and Location Map |
|---|---|---|
| | 2-3 | Typical Cross Section |
| | 4 | Standard Plans List |
| | 5-20 | Layouts |
| | 21-22 | Profile |
| | 23 | Superelevation Diagram |
| | 24 | Construction Details |
| | 25-36 | Drainage |
| | 37-38 | Stage Construction |
| | 39 | Construction Area Signs |
| | 40-56 | Pavement Delineation |
| | 57-59 | Summary of Quantities |
| | 60 | Sign Quantities and Details |
| | 61-63 | Retaining Wall Plans |
| | 64-66 | Electrical |

# DEPARTMENT OF T

## PROJECT PLANS FOR
# STATE H
### IN SANTA BARB

### NEAR LOMPOC FROM H

### TO 0.1 MILE NORTH OF LO

To be supplemented by Standard



LOMPOC

**BEGIN WORK AND CONSTRUCTION**
**STA. "A" 32+08.86 PM 23.3**

CONSTELLATION RD. UC

"C-N" 141+10.10 Rt Bk
"C-S" 141+10.10 Bk=
"A-L" 140+88.67 Ahd

"A" 106+00 Bk=
"C-N" 106+29.81 Rt Ahd
"C-S" 106+12.76 Lt Ahd

CONSTELLATION RD.

VANDENBERG VILLAGE

NO SC

The Contractor shall possess the Class (or Classes) of license
as specified in the "Notice to Contractors".

FOR REDUCED PLANS
ORGINAL SCALE IS IN INCHES

**EXHIBIT C**





**EXHIBIT D**



**EXHIBIT E**

```
 1  ROBERT C. BONNER
    United States Attorney
 2  FREDERICK M. BROSIO, JR.
    Assistant United States Attorney
 3  Chief, Civil Division
    SUZETTE CLOVER
 4  Assistant United States Attorney
        1100 United States Courthouse
 5  ·       312 North Spring Street
        Los Angeles, California 90012
 6      Telephone:  (213) 894-2442

 7  Attorneys for Defendants

 8                  UNITED STATES DISTRICT COURT

 9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  MARILYN ANN FAHRNER, HARVEY    )  No. CV 88-05
    GREEN, EDWARD VAN VALKENBURGH, )
12  CARLA CARNEY [nee PEDERSEN],   )  STIPULATION FOR COMPROMISE
    et al.,                        )
13                                 )  SETTLEMENT AND ORDER THEREON
            Plaintiffs,            )
14                                 )      OF DISMISSAL
        v.                         )
15                                 )
    COLONEL RONALD D. OLIVERIO, Base )
16  Commander of Vandenberg Air Force)
    Base; UNITED STATES AIR FORCE;  )
17  an agency of the UNITED STATES, )
                                    )
18          Defendants.            )
                                    )
19
20      IT IS HEREBY STIPULATED between plaintiffs and defendants,

21  by and through their respective attorneys, as follows:

22      Plaintiffs and defendants do hereby agree and stipulate to

23  settle and compromise the above-entitled action on the terms

24  indicated herein.

25      1.  All letters issued to plaintiffs pursuant to

26  18 U.S.C. § 1382 barring them from Vandenberg Air Force Base and

27  from use of roads outside the gates of Vandenberg Air Force

28  Base, but inside the legal boundaries of the Base, will be
```

FILED

MAY - 8 1989

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

MAY - 9 1989

CENTRAL DISTRICT
BY

- 2 -

1 | rescinded as of the effective date of this Stipulation.  All
2 | outstanding 18 U.S.C. § 1382 citations pending against
3 | plaintiffs shall be deemed withdrawn as of the effective date of
4 | this Stipulation.

5 |     2.   The fence at the two western corners of the
6 | intersection at the Main Gate (Santa Maria Gate) has been
7 | removed.

8 |     3.   All physical evidence taken by military personnel at
9 | the Main Gate, if still in the possession of the Air Force, will
10 | be returned to plaintiffs.  Plaintiffs will be permitted to
11 | review all photographs and videotapes of plaintiffs at the Main
12 | Gate taken by military personnel. Copies of all photographs and
13 | videotapes will be provided to plaintiffs at their request and
14 | at their expense.

15 |     4.   The attached policy statement is incorporated by
16 | reference herein and will be issued as of the effective date of
17 | this Stipulation.

18 |     5.   This agreement and Stipulation shall not constitute an
19 | admission of liability or fault on the part of defendants, or on
20 | the part of any of their agents or employees.

21 |     6.   In consideration of the terms set forth above,
22 | plaintiffs hereby agree to the dismissal of the above action
23 | with prejudice.  The parties shall each bear their own costs and
24 | attorney's fees.

25 | ---

26 | ---

27 |

28 |                              - 3 -

This Stipulation for Compromise Settlement is made subject
to the approval of this Court.

DATE: ~~March~~ April 1, 1989 , 1989.          DATE: ~~March~~ April 1 , 1989.

_____                    _____
EDWARD VAN VALKENBURG,                     HARVEY GREEN, Plaintiff
Plaintiff
DATE: ~~March~~ April 1, 1989 , 1989.          DATE: ~~March~~ April 7 , 1989.

_____                    _____
MARILYN ANN FAHRNER, Plaintiff             CARLA CARNEY (nee Peterson)

DATE: March 28, 1989                       DATE: ~~March~~ 4/24 , 1989

_____                    _____
RICHARD C. SOLOMON                         KEN FALSTROM
Attorney for Plaintiffs                    Attorney for Plaintiffs

                                           ACLU FOUNDATION OF SOUTHERN
                                           CALIFORNIA

DATE: ~~March~~ May 2 , 1989               _____
                                           CAROL A. SOBEL
                                           Attorney for Plaintiffs
DATE: ~~March~~ May 3 , 1989
                                           ROBERT C. BONNER
                                           United States Attorney
                                           FREDERICK M. BROSIO, JR.
                                           Assistant United States Attorney
                                           Chief, Civil Division

                                           _____
                                           SUZETTE CLOVER
                                           Assistant United States Attorney
                                           Attorneys for Defendants


ORDER PERMITTING FILING OF STIPULATION

FOR COMPROMISE SETTLEMENT

The above stipulation may be filed. Plaintiffs' ~~complaint~~ action is
hereby dismissed with prejudice. No costs .

DATED: ~~This ____ day of March, 1989.~~ MAY - 6 1989

                                           A. WALLACE TASHIMA
                                           _____
                                           UNITED STATES DISTRICT JUDGE

- 4 -

UNITED STATES AIR FORCE

VANDENBERG AIR FORCE BASE

### Statement of Policy

People involved in peaceful protest demonstrations will be permitted to assemble and protest in the concurrent jurisdiction areas adjacent to the intersection of State Highway 1 and Lompoc-Casmalia Road at the Main Gate (Santa Maria Gate) of Vandenberg Air Force Base, California. The Air Force is obligated to insure that peaceful protests do not result in unsafe vehicle and people congestion around the Main Gate. If necessary, restrictions may be placed on peaceful protestors who encumber the roadways or engage in activities which can result in unsafe conditions for themselves or others. Protest demonstrations may be curtailed in this area when they materially interfere with or have a significant impact on the conduct of the military mission of the U.S. Air Force.

RONALD D. OLIVERIO, Colonel, USAF
Commander, 4392 Aerospace Support Wing

21 February 1989
DATE

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

I am employed in the County of Santa Barbara, California. I am over the age of eighteen and not a party to the within action. My business address is 2640 Las Encinas Lane, Santa Barbara, CA 93105-2923.

On January 23, 2003, I served the following document(s):

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DECLARATIONS AND EXHIBITS IN SUPPORT

on the interested parties in this action by placing true and correct copies thereof in the U.S. mail in Santa Barbara County, postage prepaid, enclosed in sealed envelopes addressed as follows:

Gwendolyn M. Gamble
Assistant United States Attorney
Federal Building, Room 7516
300 No. Los Angeles St.
Los Angeles, CA 90012

I am a member of the State Bar of the United States District Court, Central District of California. Executed on January 23, 2003, at Santa Barbara, California. I hereby certify under penalty of perjury that the foregoing is true and correct.

Richard C. Solomon

**EXHIBIT F**

